THE CLARA TURNER COMPANY *vs.* THE NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY.

CLARA TURNER HAMMOND *vs.* THE NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY.

Third Judicial District, New Haven, June Term, 1912.
HALL, C. J., PRENTICE, THAYER, RORABACK, AND WHEELER, Js.

A railroad company does not hold goods in the capacity, and subject to the special liability, of a common carrier, until there has been a complete delivery of the goods for immediate transportation.

In the present case a theatrical company engaged a car to transport their scenery and properties, including two ponies, on a certain train which was to leave Monday morning, and on Saturday the owners loaded all their goods, except the ponies, on a car, which the

railroad company then moved to a convenient place for loading the ponies, and it was understood by both parties that the ponies would not be loaded until Monday morning. On Sunday the goods were destroyed by fire, without negligence of the railroad company. *Held* that the responsibility of the railroad company for the goods as a common carrier had not attached, and that it was not liable for the loss.

Argued June 7th—decided July 26th, 1912.

ACTIONS to recover damages for injury to plaintiffs' goods by fire while in the defendant's car, brought to and tried by the Superior Court in New Haven County, *Burpee, J.;* facts found and judgments rendered for the plaintiffs for $7,595, and appeals by the defendant. *Error, and causes remanded with direction to render judgment for the defendant in each case.*

The plaintiff, the Clara Turner Company, is a traveling theatrical company, of which the plaintiff in the second case is the principal actress.

The record in the first case is the only printed one before us; the parties having stipulated that the judgment rendered by this court upon the appeal in that case shall also be rendered in the other case.

The complaint, in the record before us, alleges that on the 6th of February, 1909, the plaintiff delivered at New London to the defendant as common carrier certain theatrical scenery, properties, animals, and other property for stage performances, of the value of about $6,000, to be carried by the defendant to Middletown; that on said day the defendant as such common carrier received said property upon the agreement that it, together with certain ponies, should be loaded into a special baggage-car and transported to Middletown by a passenger-train, to leave New London on Monday morning, February 8th; that prior to February 8th the defendant loaded said property, not including the ponies, into the baggage-car for transportation, but

before the loading of the car was completed, and the car attached to the passenger-train, and while the property was in the possession of the defendant as common carrier, it was destroyed by fire; that before the defendant received the property the plaintiff was required to sign a writing by virtue of which the defendant claims it was not acting as a common carrier in respect to said goods, and that it is not liable for any damage to them, although caused by its negligence, whereas the defendant was acting as a common carrier in respect to said goods at the time of said loss.

The following are among the facts found by the trial court upon the issues framed under the defendant's several defenses and the plaintiff's reply thereto:—

In February, 1909, and for a long time prior thereto, there were in force on the lines of the defendant certain published rates for the carriage of various miscellaneous articles in certain ways and on certain terms, one of the sections of which was in part as follows: "Via all rail lines, cars will be provided in regular trains, for theatrical scenery and properties for stage performances, between local stations, provided block ticket is purchased for ten or more persons, and release (Form B 257) must be signed by the person in charge." Then follow the rates.

On February 1st the defendant wrote to the plaintiff stating the charges for the carriage of theatrical scenery, etc., under said rule, from New London to Middletown, and the time of the departure of trains from New London. The following is a part of said letter: "As requested in your favor of the 28th ult. we submit below itinerary covering movement of the Clara Turner Company, numbering ten or more people, requiring one sixty-foot horse and carriage car for their effects. We give probable schedule, distance, per capita fare, and charge for baggage-car, the latter to be prepaid baggage-

master at initial point, who will ·take release form B. 257 (sample of which is enclosed herewith) before baggage-car will be forwarded. As the railroad company takes no cognizance of the effects loaded in the cars, and imposes no restrictions other than that they shall be effects used in theatrical productions, it is understood that your company will assign a man to safe-guard your effects while in the car, both at terminal points and while in transit, as the railroad company will not assume responsibility for safe-guarding contents of the car. Also that your authorized representative will give proper notice at initial points, as soon as car is loaded and ready to go forward. A block ticket for a minimum of ten passengers must be purchased on every movement." Here follows schedule of trains and rates.

Form B 257 referred to in said letter is as follows: "In consideration of the transportation on passenger trains, of certain properties and animals used in public entertainment, belonging to          company, or members of said company, between . . . . . . . . . . . . and . . . . . . . . . . ,. I, as owner or duly authorized agent of the owners, hereby release The New York, New Haven and Hartford Railroad Company, and the other transportation company or companies forming a part of the through route to destination, from any and all liability for loss, injury or delay to such properties or animals, in whatever manner caused, whether by negligence or otherwise, while in its or their possession or control, or on its or their premises; it being understood and agreed that the said company or companies have only covenanted to undertake such transportation on its or their passenger trains, instead of freight trains, in consideration of such release from liability as hereinbefore provided, and that in such transportation, the said railroad company and its connections are not to be considered common carriers or liable as such."

Said release was the same form used by the defendant
in previous similar transactions with the plaintiff, and it
did not appear and was not claimed that the defendant
ever performed or held itself out to perform such serv-
ice on any terms not including the signing of such bond.

The plaintiff signed said release, and it was agreed
by the parties that said theatrical property of the plain-
tiff, including two ponies, should be transported by the
defendant from New London, where the plaintiff
company was then playing, to Middletown in a baggage-
car to be attached to a passenger-train leaving New
London Monday, February 8th, at 7:35 a. m.

On Saturday morning, some time before ten o'clock,
in accordance with plaintiffs' request, the defendant
placed a baggage-car on a spur track west of the New
London passenger-station.  It was the understanding
of both parties that the plaintiffs could have access to
the car at any time after it was set out for loading on
Saturday morning, for the purpose of placing therein
anything used in the business of the plaintiffs which it
was desired to put on board.  Shortly after said car
was so placed, employees of the plaintiffs proceeded to
load therein such of the stage scenery and theatrical
properties of the company and its members as had been
used in the performance given earlier in the week, and
would not be needed in the performances of Saturday
afternoon and evening.  After the afternoon and even-
ing performances of Saturday, the stage scenery and
properties used in these performances were likewise
taken to the car and put on board; the last of this work
being done at about midnight of said day.  The work
of putting said effects on board the car was done entirely
by employees of the plaintiffs.  At midnight of Satur-
day, February 6th, there remained to be loaded in
said car two ponies, used by the plaintiffs in their
performances, which it was not intended to put on

board until Monday morning, February 8th. It was the custom of the plaintiffs, and it was intended by both parties, that said ponies should be put on board about an hour before the time scheduled for the car to leave. At about twelve o'clock on Saturday night the plaintiffs' agent, in answer to his inquiry, told an employee of the defendant, who was standing near the car with a lantern, that everything was in the car. He knew that the ponies were not in, but supposed this employee knew it also, and he intended to be so understood. The plaintiffs' said agent supposed this man to be the defendant's yardmaster, but it appeared that he was not. At about the time the loading of the car commenced on Saturday, February 6th, the plaintiff's business manager paid the agreed freight, $14.40, which was the usual rate, purchased a block ticket for ten passengers, and signed said printed release, Form B 257. Some time on Sunday, February 7th, the yardmaster of the defendant, without any request from the plaintiffs, ordered said car moved from the spur-track at the west end of the station to a freight-track on the opposite side of the yard. In accordance with said order, the car was placed on the opposite side of the yard, at a point where there was a freight-platform at the same level as the floor of the car. On the previous Sunday the man in charge of the plaintiffs' ponies, and who usually traveled with them, had requested that the car be placed at this point for his convenience in unloading. On several previous occasions when the plaintiffs were in New London, the ponies had been loaded at this point; but it was not necessary to load them there, because the plaintiffs had what is called a "run," by means of which they could load the ponies from the level of the tracks. The defendant's yardmaster was unaware that the plaintiffs carried a "run" which might have been used for loading the ponies into the

car without moving it from said spur-track. At about midnight of Sunday, February 7th, a fire broke out in the freight-house of the defendant and spread to the car containing the plaintiffs' goods. The contents of the car were badly damaged by fire, and by water used in the endeavor to put it out, and this damage is the foundation of the present action. Between midnight of Saturday, when the last of the goods loaded that night had been put on board, and midnight of Sunday, when the fire broke out, the doors of the car had been locked. It did not appear who locked the doors. The defendant held itself out to perform in common for all theatrical companies the same service, and upon the same terms and conditions, which it contracted to render to the plaintiffs in the present action in respect of the goods lost and damaged. It was not practicable for the plaintiffs to transport their goods by freight-trains during the theatrical season.

The finding states the following conclusions of the trial court from the facts found: "(1) Before the fire the plaintiffs' property had been delivered and received by the defendant for transportation as a common carrier. (2) The so-called release signed by the plaintiffs' agent on February 6, 1909, did not exempt the defendant from all liability for loss or injury, however caused."

The amount of the judgments rendered by the Superior Court in the two cases was $7,595.30.

*Harry G. Day* and *Thomas M. Steele,* for the appellant (defendant).

*John K. Beach* and *Samuel A. Davis,* for the appellees (plaintiffs).

HALL, C. J. The complaint contains no averment of negligence upon the part of the defendant in any capacity. The finding shows no offer of proof of negligence. The sole ground of the alleged liability

of the defendant is that, at the time of the fire, the goods were in its possession as a *common carrier*. The averment of paragraph four of the complaint is that, "while said property was in the possession of said defendant as common carrier," said property was destroyed. In order to recover in this action, the plaintiff was required to prove this averment. The trial court held that it had been proved. The defendant's appeals to this court question the correctness of the conclusions of the trial court, as above stated.

The defendant's principal claims before us are, in substance, these: *First.* That even if it be assumed that, in receiving and transporting the goods in question, the defendant was to act as a common carrier, yet the admitted facts, and the facts proved, show that, before the fire, there had been no such completed delivery to the defendant of the goods, for transportation, as rendered it liable as a carrier, for their loss. *Second.* That if the goods can be regarded as having been completely delivered to the defendant as a carrier, yet by the special methods in which they were to be delivered and carried, and by the terms of the release signed by the plaintiffs' agent, the defendant became a private and not a common carrier of the goods; and that the defendant was relieved from the ordinary strict liability of a common carrier, and from any liability for the loss of the goods in question.

The law is well settled that until the goods to be carried are delivered for immediate transportation, the receiver does not hold them in the capacity of common carrier. His liability in that capacity commences upon the complete delivery of the goods for immediate transportation. 1 Wyman on Public Service Corporations, § 393.

In *Barron* v. *Eldridge*, 100 Mass. 455, the question arose whether certain flour and grain belonging to the

plaintiff, which was destroyed by fire while in the defendants' shed and elevator, was held by the latter as warehousemen or as common carriers. The court, on pages 458, 459, said: "The responsibility of a common carrier, for goods intrusted to him, commences when there has been a complete delivery for the purpose of immediate transportation. . . . The delivery must be for immediate transportation, and, of course, it cannot be complete if anything remains to be done by the shipper before the goods can be sent on their way."

In *Watts* v. *Boston & Lowell R. Corp.*, 106 Mass. 466, the property was destroyed by fire before transportation and before the shipper had delivered the entire lot to be shipped. The court said (p. 468): "It could not be said that the duty of carriage had commenced, until the whole had arrived. . . . It [the ruling of the trial court] lays upon them the liability of carriers, while they have as yet assumed only the duties of warehousemen."

Other authorities to the same effect are: *Murray* v. *International Steamship Co.*, 170 Mass. 166, 48 N. E. 1093; *Judson* v. *Western R. Corp.*, 4 Allen (Mass.) 520; *Tate & Co.* v. *Yazoo & M. V. R. Co.*, 78 Miss. 842, 29 So. 392; *Kansas City M. & O. Ry.* v. *Cox*, 25 Okl. 774, 108 Pac. 380; *Basnight* v. *Atlantic & N. C. R. Co.*, 111 N. Car. 592, 16 S. E. 323; *O'Neil* v. *New York Central & H. R. R. Co.*, 60 N. Y. 138; *St. Louis, A. & T. H. R. Co.* v. *Montgomery*, 39 Ill. 335.

There is perhaps not so much dispute as to the law applicable to this point, as upon the questions of what facts have been found respecting the delivery of the goods for transportation, and what inferences or conclusions could properly have been drawn by the trial from court from such facts.

The plaintiffs, in accordance with the conclusion of the trial court, claim that the facts found show that

there was a delivery of the goods to the defendant as a common carrier, and that the defendant had them in its custody in that capacity at the time of the fire; while the defendant claims that the facts show that they were not so delivered to and held by the defendant.

It is expressly alleged, both in paragraph four of the complaint and in the plaintiffs' reply to the third defense, that the loading of the car had not been completed at the time of the fire.

Regarding the delivery of the goods to the defendant, these facts appear from the finding: The defendant furnished the plaintiffs with a baggage-car to be used in the transportation of the plaintiffs' theatrical goods, including two ponies, from New London to Middletown. The car was to be loaded by the plaintiffs and was to be attached by the defendant to its passenger-train which left New London at 7:35 Monday morning. The plaintiffs were to give proper notice at initial points as soon as the car was loaded and ready to go forward, and were to assign a man to safeguard the goods in the car. The ponies were not to be placed in the car until Monday morning, and not later than one hour before the time the passenger-car was to leave New London. They had not been placed in the car at the time of the fire, and no notice, other than that above stated, had been given, that the car was loaded and was ready to go forward, and it does not appear that the plaintiffs had assigned a man "to safeguard" the effects in the car.

These facts clearly show that, at the time of the fire, the plaintiffs' goods, which were to be transported by the defendant, had not been completely delivered, but that there remained something to be done by the shipper before they could be sent on their way. But the plaintiffs claim that it appears that on Saturday night they notified the defendant that everything was in the car;

that thereafter the defendant took charge of the car, and locked it, and moved it from the spur-track to a freight-track on the other side of the yard, and thereby took the plaintiffs' property into its custody as a carrier.

There was no other notice given than that the plaintiffs' agent, at about twelve o'clock Saturday night, told an employee of the defendant, and who was not the yardmaster, but was standing near the car, that everything was in the car. The plaintiffs' agent knew that the ponies were not in the car, and supposed that said employee knew they were not. He did not intend to be understood, nor suppose he was understood, as saying that the ponies had been placed in the car. It was evidently understood by both parties that the ponies were thereafter to be placed in the car.

It does not appear by whom the car was locked, nor does it appear that the car was moved with the intention on the part of the defendant to thereby take control of the plaintiffs' goods as ready for transportation. Apparently the car was moved by the defendant for the convenience of the plaintiffs in loading the ponies, and it does not appear to be material by whom it was locked.

The trial court erred in its conclusion from the facts found that before the fire the plaintiffs' property had been delivered to and received by the defendant for transportation as a common carrier.

Our conclusion above stated controls the decision of both of said cases, and renders it unnecessary for us to decide said second claim of the defendant, as to the validity and effect of said release.

There is error, and the judgments of the Superior Court in said cases are reversed, and the cases remanded with direction to render judgment in said cases for the defendant.

In this opinion the other judges concurred.